**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Davina Smith, | : | Case No. 1:12 CV 1466 |
| | : | |
|       Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
|       Defendant, | : | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Davina Lee Smith ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 12 and 13) and Plaintiff's Response

(Docket No. 15). For the reasons that follow, the Magistrate recommends that the decision of the

Commissioner be reversed and the case remanded to the Commissioner for further proceedings

consistent with this opinion.[1]

---

[1] The Magistrate is aware that Plaintiff was found to be disabled under the Social Security regulations the day after the unfavorable decision at issue in this opinion was issued (Docket No. 17). Therefore, this opinion will deal only with Plaintiff's application for benefits as it pertains to the alleged onset date through the date of the original decision, September 17, 2010.

## II. PROCEDURAL BACKGROUND

On September 11, 2008, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, p. 98 of 590). On that same day,

Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381

(Docket No. 10, p. 100 of 590)[2]. In both applications, Plaintiff alleged a period of disability beginning

July 11, 2008 (Docket No. 10, pp. 98, 100 of 590). Plaintiff's claims were denied initially on

December 23, 2008 (Docket No. 10, pp. 77, 81 of 590), and upon reconsideration on July 1, 2009

(Docket No. 10, pp. 85, 88 of 590). Plaintiff thereafter filed a timely written request for a hearing on

July 16, 2009 (Docket No. 10, p. 91 of 590).

On September 15, 2010, Plaintiff appeared with counsel for a hearing before Administrative

Law Judge Irving A. Pianin ("ALJ Pianin") (Docket No. 10, pp. 40-70 of 590). Also appearing at the

hearing was an impartial Vocational Expert ("VE") (Docket No. 10, p. 42 of 590). ALJ Pianin found

Plaintiff to have a severe combination of lupus (SLE),[3] back disorder, peripheral neuropathy, chronic

obstructive pulmonary disease ("COPD"),[4] obesity, depression, and anxiety with an onset date of July

11, 2008 (Docket No. 10, pp. 24-25 of 590).

---

[2]Plaintiff protectively filed concurrent applications on August 29, 2008 (Docket No. 10, p. 43 of 590)

[3] An inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains or arthritis resembling rheumatoid arthritis, diffuse erythematous skin lesions on the face, neck, or upper extremities, with liquefaction degeneration of the basal layer and epidermal atrophy, lymphadenopathy, pleurisy or pericarditis, glomerular lesions, anemia, hyperglobulinemia, and a positive LE cell test, with serum antibodies to nuclear protein and sometimes to double-stranded DNA and other substances. STEDMAN'S MEDICAL DICTIONARY, 233790 (27th ed. 2000).

[4] Any group of debilitating, progressive, and potentially fatal lung diseases that have in common increased resistance to air movement, prolongation of the expiratory phase of respiration, and loss of the normal elasticity of the lung. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

2

Despite these limitations, ALJ Pianin determined, based on all the evidence presented, that

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through the date of his decision, September 17, 2010 (Docket No. 10, p. 33 of 590).

ALJ Pianin found Plaintiff had the residual functional capacity to perform light work with the

following exceptions:

1.  No more than occasional postural activity
2.  No excessive exposure to environmental conditions (dust, fumes, odors, gases)
3.  Only occasional contact with coworkers, supervisors, and the public due to moderate limitations in social functioning

(Docket No. 10, p. 28 of 590). ALJ Pianin found Plaintiff unable to perform any of her past relevant

work, but able to perform other work in the economy (Docket No. 10, p. 32 of 590). Plaintiff's request

for benefits was therefore denied (Docket No. 10, p. 33 of 590).

On June 11, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern

Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading,

Plaintiff alleged the ALJ failed to follow the treating physician rule (Docket No. 12). Defendant filed

its Answer on August 30, 2012 (Docket No. 9).

### III. FACTUAL BACKGROUND

#### A.    THE ADMINISTRATIVE HEARING

An administrative hearing convened on September 15, 2010, in Norfolk, Ohio (Docket No. 10,

p. 42 of 590). Plaintiff, represented by counsel Mira Chopra, appeared via video from Erie,

Pennsylvania, and testified (Docket No. 10, p. 42 of 590). Also present and testifying was VE Robin

Stromberg ("VE Stromberg") (Docket No. 10, p. 42 of 590).

#### 1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a forty-year old female with a high school education

(Docket No. 10, p. 46 of 590). Plaintiff resided with her mother and her children, ages eighteen and twenty (Docket No. 10, p. 45 of 590). Plaintiff testified that she last worked in July 2008, but left that job because of her diagnosis of lupus and COPD as well as her general inability to deal with people (Docket No. 10, pp. 47-48 of 590). Plaintiff stated that she experienced severe anxiety and fatigue while on the job and was absent from work at least four to five times per month (Docket No. 10, pp. 59-60 of 590). Plaintiff testified that she collected unemployment from August or September 2008 until approximately four or five months before the administrative hearing (Docket No. 10, p. 47 of 590). Plaintiff acknowledged that, in order to receive unemployment benefits, she had to represent to the state that she was able and willing to work and also acknowledged that she was required to report any change in her status (Docket No. 10, pp. 47-48 of 590). Plaintiff testified that, at the time she filled out the unemployment questionnaire in August or September of 2008, she indicated that was willing and able to work but that, in fact, she was not able to work (Docket No. 10, p. 47-48of 590).

Plaintiff gave testimony concerning a number of her alleged impairments, including her back pain, lupus, and anxiety (Docket No. 11, pp. 45-64 of 590). With regard to her lupus, Plaintiff indicated that she suffers from chronic pain, stiffness of her muscles and joints, and difficulty breathing (Docket No. 10, p. 48 of 590). Plaintiff stated that her symptoms are constant and do not improve with medication (Docket No. 10, p. 49 of 590). Plaintiff also testified that she has some periods where her symptoms are worse than others, commonly referred to as "flare-ups," during which she gets a rash and/or blotches on her body and has to use steroid cream (Docket No. 10, p. 49 of 590). Plaintiff indicated that she has chronic pain in her hands which makes it difficult for her to hold onto things or open pill bottles (Docket No. 10, p. 56 of 590). Plaintiff stated that her pain has gotten worse since she stopped working in 2008 (Docket No. 10, p. 59 of 590).

In describing her anxiety, Plaintiff indicated that she made several trips to the emergency room for this condition (Docket No. 10, p. 50 of 590). She denied that these trips were for the sole purpose of obtaining refills of her anxiety medication Ativan (Docket No. 10, p. 50 of 590). Plaintiff testified that she had not undergone treatment with a psychologist or psychiatrist, but has been taking .5 miligrams of Ativan three times per day for two and one-half years (Docket No. 10, p. 53 of 590). Plaintiff claimed that the Ativan did not work to control her anxiety (Docket No. 10, p. 53-54 of 590). She also testified that she had been taking Zoloft for about a month (Docket No. 10, pg. 53 of 590). Plaintiff stated that she panics "as soon as [she] walk[s] out of the house," or attempts to be around people (Docket No. 10, p. 57 of 590). Plaintiff indicated that she is prone to daily crying spells and experiences twitching, moving, and shaking in her leg as a result of the anxiety (Docket No. 10, p. 62 of 590).

Plaintiff stated that she has not yet received treatment for her back pain because her anxiety attacks make it impossible for her to leave her house and go to the doctor (Docket No. 10, p. 51 of 590). She indicated that she has only tried medication to manage her pain and stated that she was ordered to physical therapy but never went (Docket No. 10, p. 51 of 590). Plaintiff also stated that she was prescribed injections for her pain, but never had them because she "freaked out" (Docket No. 10, p. 51 of 590).

ALJ Pianin also questioned Plaintiff about her residual functional capacity. Plaintiff indicated that she could lift approximately five pounds (Docket No. 10, p. 50 of 590). Plaintiff testified that she could stand up for ten to fifteen minutes before needing a break, and could sit down for approximately fifteen minutes before becoming restless (Docket No. 10, p. 51 of 590). Plaintiff stated that she was able to walk from the couch to the bathroom or maybe her kitchen without having to sit down (Docket

5

No. 10, p. 52 of 590). Plaintiff testified that she does not do her own household chores, including

changing of bed linens, laundry, cooking, or food shopping (Docket No. 10, pp. 52-53 of 590). When

asked what she does all day, Plaintiff stated that she just "kind of lay[s] around," watches television,

and talks to her mother and children (Docket No. 10, pp. 52, 55 of 590). Plaintiff accepts visitors at her

home, but does not go out with friends (Docket No. 10, p. 55 of 590). Plaintiff also indicated that she

does not drive because of her panic attacks (Docket No. 10, p. 53 of 590). She mostly rests during the

day, sleeping approximately ten to twelve hours per day (Docket No. 10, pp. 61-62 of 590). Plaintiff

also admitted to smoking one pack of cigarettes per day despite her COPD (Docket No. 10, p. 46 of

590).

### 2. VOCATIONAL EXPERT TESTIMONY

VE Stromberg testified that she had familiarized herself with Plaintiff's file and vocational

background prior to the hearing (Docket No. 10, pp. 65-66 of 590). ALJ Pianin then posed his first

hypothetical question:

> . . . assume a person of the same age, education, and work background as Ms. Smith
> [inaudible] work provided. The work would not involve more than occasional, postural
> activity; would not expose the individual to any excessive dust, fumes, odors, or gases; and
> would not require more than occasional interactions with supervisors, coworkers, or the
> general public. Would there be any light or sedentary unskilled work for such a person?

(Docket No. 10, p. 64 of 590). Taking into account these limitations, the VE testified that such an

individual would not be able to perform Plaintiff's past work (Docket No. 10, p. 64 of 590). The VE

stated that there was other work that the hypothetical person could perform, including: (1)

production/assembly line worker, listed under DOT 782.684-058, for which there are 200,000

positions nationally and 4,000 locally; (2) hand packer, listed under DOT 920.587-018, for which there

are 47,000 positions nationally and 1,000 locally; and (3) office helper (back office), listed under DOT

239.567-010, for which there are 200,000 positions nationally and 7,000 locally (Docket No. 10, pp. 64-66 of 590).

ALJ then proposed a second hypothetical, asking "if the limitations except for the requirement [inaudible], according to her ability to lift, carry, sit, stand, and walk, the testimony regarding her need to lie down and nap, and the frequency and severity of the panic or anxiety attacks, [inaudible] would any full-time work be possible?" (Docket No. 10, p. 65 of 590). With these additional limitations, the VE indicated that the hypothetical person would not be able to perform any full-time work (Docket No. 10, p. 65 of 590).

During cross-examination, Plaintiff's counsel inquired as to what would happen if, in addition to the limitations posed in the ALJ's first hypothetical, "there would need to be two or more unscheduled breaks taken in addition to the regular breaks due to sympomalogy[sic] or treatment of the sympotomalogy[sic]" (Docket No. 10, p. 67 of 590). VE Stromberg indicated that there would be no jobs available with this additional limitation (Docket No. 10, p. 67 of 590). The VE further maintained this position when Plaintiff's counsel added the following limitations: (1) the claimant is incapable of sitting or standing for even two hours during an eight-hour workday; (2) the claimant is incapable of even low stress jobs; and (3) the claimant would have to be absent four days per month (Docket No. 10, pp. 68-69 of 590). VE Stromberg also testified the other work previously provided would not be compatible with an individual who had a need to get up and walk around every ten minutes (Docket No. 10, p. 68 of 590).

B.    MEDICAL RECORDS[5]

Plaintiff's medical records date back to May 14, 2001, when she saw Dr. Amitabh Goel, MD

("Dr. Goel") complaining of pain in the right upper quadrant of her abdomen (Docket No. 10, p. 469 of

590). Plaintiff chose to undergo an elective laparoscopic cholecystectomy[6] on May 31, 2001 (Docket

No. 10, p. 467 of 590). By July 13, 2001, Dr. Goel indicated that Plaintiff was doing extremely well

after surgery and did not require further follow-up (Docket No. 10, p. 463 of 590).

Plaintiff first saw her primary treating physician, Dr. Yasser Mikhail ("Dr. Mikhail") on

September 9, 2003, when she presented with hypertension, anxiety, weight gain, and

tiredness/weakness (Docket No. 10, p. 290 of 590). At that time, Plaintiff weighed 243 pounds (Docket

No. 10, p. 290 of 590). On May 10, 2004, Plaintiff reported to Dr. Mikhail following a visit to the

emergency room complaining of difficulty swallowing and dizziness (Docket No. 10, p. 289 of 590).

Dr. Mikhail noted that Plaintiff was obese and had uncontrolled hypertension (Docket No. 10, p. 289

of 590). On August 14, 2004, Plaintiff presented to the Memorial Hospital of Geneva Emergency

Room ("Memorial ER") complaining of generalized weakness and achiness in her arms and legs

(Docket No. 10, p. 447 of 590). Plaintiff was diagnosed with generalized myalgias of uncertain

etiology (Docket No. 10, p. 447 of 590).

Plaintiff saw Dr. Mikhail multiple times over the next few months, complaining of numerous

conditions such as a lump in her chest, flu-like symptoms, skin flushing, earaches, and blurry vision

following a household accident (Docket No. 10, pp. 282-86 of 590). Plaintiff also presented to the

---

[5] Plaintiff's medical records start in 2001 and go through September 2011. Since ALJ Pianin only
had the benefit of reviewing records that went through the date of his decision, September 17, 2010, this
opinion will only cover and include those same medical records.

[6] Removal of gallstones. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

Memorial ER two times during this same time period complaining of similar symptoms (Docket No. 10, pp. 438-42 of 590). On November 7, 2006, Plaintiff was counseled by Dr. Mikhail on the need to quit smoking (Docket No. 10, p. 282 of 590). On January 18, 2007, Plaintiff returned to the Memorial ER with symptoms of an anxiety attack (Docket No. 10, p. 429 of 590). On January 22, 2007, Plaintiff saw Dr. Mikahil after complaining of rapid heartbeat (Docket No. 10, p. 280 of 590). Plaintiff was diagnosed with severe hypokalemia[7] and admitted to still smoking one pack of cigarettes per day (Docket No. 10, p. 280 of 590). Plaintiff was again counseled by Dr. Mikhail on the importance of quitting smoking on March 8, 2007 (Docket No. 10, p. 279 of 590). By this time, Dr. Mikhail's notes indicated that Plaintiff's anxiety was well-controlled on Ativan (Docket No. 10, p. 279 of 590).

On May 30, 2007, Plaintiff complained to Dr. Mikhail of pain and numbness in her right shoulder as well as groin pain (Docket No. 10, p. 278 of 590). Dr. Mikhail diagnosed Plaintiff with possible radiculopathy and arthritis in her right hip (Docket No. 10, p. 278 of 590). By June 14, 2007, Plaintiff was complaining of persistent neck pain and an increase in her panic attacks (Docket No. 10, p. 277 of 590). Plaintiff was started on Cymbalta to help with the anxiety (Docket No. 10, p. 277 of 590). During mid to late 2007 through early 2008, Plaintiff complained of various levels of coughing, wheezing, chest tightness, and postnasal drainage (Docket No. 10, pp. 229, 236, 243, 248, 274, 275 of 590). Plaintiff was diagnosed with acute bronchitis, asthmatic bronchitis, and advised to quit smoking (Docket No. 10, pp. 229, 236, 238, 243, 248, 275 of 590). On March 6, 2008, Plaintiff presented to the Ashtabula County Medical Center Emergency Room ("Ashtabula ER") complaining of abnormally heavy uterine bleeding and claiming to have passed large clots (Docket No. 10, p. 404 of 590). She

---

[7] An abnormally low concentration of potassium in the blood. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

was diagnosed with menometrorrhagia[8] (Docket No. 10, p. 404 of 590).

On June 12, 2008, Plaintiff went in to see Dr. Mikhail complaining of a progressive cough and yellowish sputum that was unresponsive to antibiotics (Docket No. 10, pp. 250, 255-56 of 590). Plaintiff admitted to still smoking one pack of cigarettes per day (Docket No. 10, p. 260 of 590). Plaintiff was admitted to the Geneva Medical Center overnight and given a breathing treatment (Docket No. 10, p. 260 of 590). On August 6, 2008, Plaintiff saw Dr. William S. Mirando, MD ("Dr. Mirando") complaining of a rash comprised of pink indurated plaques on her mid to lower chest and back (Docket No. 10, p. 262 of 590). Plaintiff underwent a shave biopsy to determine the rash's pathology (Docket No. 10, p. 262 of 590). On August 20, 2008, Plaintiff returned to Dr. Mirando as the rash had now moved to her face (Docket No. 10, p. 261 of 590). Dr. Mirando diagnosed Plaintiff with probable lupus (SLE) (Docket No. 10, p. 261 of 590).

On September 4, 2008, Plaintiff presented to Dr. Mikhail claiming that she was experiencing the sudden onset of severe back pain (Docket No. 10, pp. 269, 291 of 590). Plaintiff had tenderness in her lumbosacral spine and was diagnosed with a possible muscle spasm or compression fracture (Docket No. 10, pp. 269, 291 of 590). On September 15, 2008, Plaintiff returned to Dr. Mikhail claiming that the pain was radiating into her buttocks (Docket No. 10, p. 268 of 590). An x-ray showed mild degenerative disease (Docket No. 10, p. 268 of 590).

On September 19, 2008, Plaintiff saw Dr. Arminda Lumapas, MD ("Dr. Lumapas") for her newly diagnosed lupus (Docket No. 10, p. 307 of 590). Plaintiff had a positive ANA test and presented with some skin redness, mild tenderness in her lower quadrants, and a mild degenerative change to the

_____

[8] Excessive bleeding during and between menstrual periods. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

joints in her lower spine (Docket No. 10, p. 307 of 590). Dr. Lumapas confirmed Plaintiff's lupus

diagnosis as well and added to it lower back pain and carpal tunnel syndrome (Docket No. 10, p. 307

of 590). At this time, Plaintiff weighed 215 pounds (Docket No. 10, p. 307 of 590). On January 27,

2009, Plaintiff saw Dr. Mikhail and was diagnosed with diffuse arthritis and started on medication

(Docket No. 10, p. 365 of 590).

On February 3, 2009, Plaintiff had an MRI of her lumbar spine at the request of Dr. Mikhail

(Docket No. 10, p. 340 of 590). The scan revealed minimal disc degeneration and a one-millimeter

bulge at Plaintiff's L3-4 vertebrae without canal stenosis (Docket No. 10, p. 340 of 590). Plaintiff was

also diagnosed with some degenerative loss of height with very mild diffuse bulging at the L4-5

vertebrae and minimal disc bulging without canal stenosis at her L5-S1 vertebrae (Docket No. 10, p.

340 of 590). On February 8, 2009, Plaintiff returned to Dr. Mikhail complaining of persistent pain and

tenderness in her lumbosacral spine (Docket No. 10, p. 364 of 590). Plaintiff was given medication for

a possible herniated disc (Docket No. 10, p. 364 of 590). On February 27, 2009, Plaintiff saw Dr.

Timothy Ko, MD ("Dr. Ko"), complaining of lower back and bilateral leg pain, which she rated as a

seven out of a possible ten (Docket No. 10, p. 345 of 590). Dr. Ko diagnosed Plaintiff with lumbar

spondylosis without myelopathy, lumbosacral neuritis, lumbar displaced disc without myelopathy, and

lupus (SLE) (Docket No. 10, p. 345 of 590). Plaintiff was prescribed physical therapy and epidural

steroid injections (Docket No. 10, p. 345 of 590). Plaintiff was advised to proceed with these injections

by Dr. Mikahil on May 7, 2009 (Docket No. 10, p. 363 of 590).

On October 4, 2009, Plaintiff returned to Dr. Mikhail complaining of shortness of breath,

reflux, and high cholesterol (Docket No. 10, p. 396 of 590). A CT scan revealed somewhat

heterogeneous and enlarged thyroid lobes, a moderate hiatal hernia, remote cholecystectomy, and a left

11

adrenal nodule (Docket No. 10, p. 397 of 590). On a follow up visit on October 23, 2009, Plaintiff indicated that she failed to go for her previously ordered blood work and reported that she was still smoking one pack of cigarettes per day (Docket No. 10, p. 361 of 590). By January 14, 2010, Dr. Mikhail reported that Plaintiff was doing well and that her lupus, arthritis, and anxiety were well controlled (Docket No. 10, p. 402 of 590).

On August 12, 2010, Plaintiff presented to Dr. Mikhail complaining of increased anxiety and claimed this anxiety prevented her from leaving home (Docket No. 10, p. 510 of 590). She also complained of severe back pain, but stated that she could not see Dr. Ko because she could not leave her house long enough to get to the appointment (Docket No. 10, p. 510 of 590). At this point, Dr. Mikhail noted that Plaintiff's lupus was uncontrolled (Docket No. 10, p. 510 of 590). On September 13, 2010, Dr. Mikhail started Plaintiff on Zoloft in an attempt to control her increasing agoraphobia[9] (Docket No. 10, p. 529 of 590).

**C.    EVALUATIONS**

**1.    PSYCHOLOGICAL EVALUATION**

Plaintiff underwent a psychological evaluation with Dr. Margaret Zerba, Ph.D. ("Dr. Zerba") on October 11, 2008 (Docket No. 10, pp. 309-13 of 590). Plaintiff drove herself to the evaluation (Docket No. 10, p. 310 of 590). Plaintiff had good flow of conversation and thought, and was noted to be spontaneous, organized, and coherent (Docket No. 10, p. 310 of 590). Dr. Zerba also noted that Plaintiff appeared depressed, but with no suicidal or homicidal ideation (Docket No. 10, p. 310 of 590). Plaintiff talked about her anxiety, but did not appear to be overtly anxious during the evaluation

---

[9] A form of social phobia in which one feels overwhelming symptoms of anxiety on leaving home. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

(Docket No. 10, p. 311 of 590).

Dr. Zerba diagnosed Plaintiff with Depressive Disorder NOS, Panic Disorder without Agoraphobia, and assigned Plaintiff a Global Assessment of Functioning score of 51 (Docket No. 10, p. 312 of 590).[10] Plaintiff had no impairment with regard to her ability to understand and follow directions, pay attention to perform simple, repetitive tasks, or relate to others in a work environment (Docket No. 10, p. 312 of 590). Dr. Zerba found Plaintiff to be moderately impaired in her ability to withstand the stress and pressures of day-to-day work activity (Docket No. 10, p. 312 of 590).

## 2. MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On October 25, 2008, Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Roseann Umana, Ph.D. ("Dr. Umana") (Docket No. 10, pp. 314-17 of 590). Dr. Umana found Plaintiff to be moderately limited in several categories, including Plaintiff's ability to: (1) work in coordination with or proximity to others without being distracted by them; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) respond appropriately to changes in the work setting (Docket No. 10, pp. 314-15 of 590).

---

[10] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 51 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

13

### 3.  PSYCHIATRIC REVIEW TECHNIQUE

On the same day, Dr. Umana also completed a Psychiatric Review Technique for Plaintiff (Docket No. 10, pp. 318-31 of 590). Dr. Umana again noted that Plaintiff suffered from Depression NOS and Panic Disorder without Agoraphobia (Docket No. 10, pp. 321, 323 of 590). In assessing "Paragraph B" criteria,[11] Dr. Umana found Plaintiff to have a mild degree of limitation with regard to her activities of daily living and maintaining concentration, persistence, or pace (Docket No. 10, p. 328 of 590). Dr. Umana also noted that Plaintiff had moderate difficulty in maintaining social functioning, but no episodes of decompensation (Docket No. 10, p. 328 of 590). Dr. Umana did not find the presence of any "Paragraph C" criteria[12] (Docket No. 10, p. 329 of 590).

### 4.  PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a Physical Residual Functional Capacity Assessment on December 21, 2008 with state agency physician Dr. Leslie Green, MD ("Dr. Green") (Docket No. 10, pp. 332-39 of 590). Dr. Green reported that Plaintiff did not have any exertional, postural, manipulative, visual, or communicative limitations (Docket No. 10, pp. 332-36 of 590). Dr. Green noted that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (Docket No. 10, p. 336 of 590).

### 5.  PERIPHERAL NEUROPATHY  RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On August 12, 2010, Plaintiff underwent a Peripheral Neuropathy Residual Functional Capacity Assessment with Dr. Mikhail (Docket No. 10, pp. 501-04 of 590). Dr. Mikhail noted that

---

[11] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[12] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

Plaintiff could sit for ten minutes at a time before needing to stand up, and stand for ten minutes at a time before needing to sit down (Docket No. 10, p. 502 of 590). Dr. Mikhail also reported that Plaintiff must walk around every ten minutes for ten minutes at a time (Docket No. 10, p. 502 of 590). Plaintiff could sit and stand/walk for less than two hours during an eight-hour workday (Docket No. 10, p. 502 of 590). Dr. Mikhail indicated that Plaintiff would need to change positions at will and take unscheduled breaks for at least ten minutes at a time (Docket No. 10, p. 502 of 590).

During this evaluation, Dr. Mikhail determined that Plaintiff could: (1) lift and carry less than ten pounds occasionally; (2) lift and carry ten pounds occasionally; (3) lift and carry twenty pounds rarely; (4) twist and stoop occasionally; and (5) never crouch or squat (Docket No. 10, p. 503 of 590). It was also noted that Plaintiff had significant limitations with reaching, handling, and fingering (Docket No. 10, p. 503 of 590).

With regard to her mental health, Dr. Mikhail indicated that Plaintiff's pain and other symptoms would occasionally interfere with the attention and concentration needed to perform even simple work tasks and that Plaintiff would likely be absent from work approximately four days per month (Docket No. 10, pp. 503-04 of 590). Despite these limitations, Dr. Mikhail concluded that Plaintiff was capable of a low stress job (Docket No. 10, p. 503 of 590).

### 6.    ANXIETY QUESTIONNAIRE

Dr. Mikhail also completed an Anxiety Questionnaire with regard to Plaintiff's anxiety-based symptoms (Docket No. 10, pp. 505-06 of 590). He concluded that Plaintiff suffered from: (1) a generalized persistent anxiety accompanied by apprehensive expectation, vigilance, and scanning; (2) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid that object, activity, or situation; (3) recurrent severe panic attacks manifested by a sudden

15

unpredictable onset of intense apprehension, fear, terror, and sense of impending doom at least one time per week; (4) recurrent obsessions or compulsions which are a source of marked distress; and (5) recurrent and intrusive recollections of a traumatic experience which are a source of marked distress (Docket No. 10, p. 505 of 590). According to Dr. Mikhail, these symptoms resulted in Plaintiff's: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and (4) repeated episodes of decompensation (Docket No. 10, p. 505 of 590). Dr. Mikhail also determined that Plaintiff's symptoms resulted in Plaintiff's complete inability to function independently outside her home (Docket No. 10, p. 506 of 590).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

16

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the

17

Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

(*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Pianin made

the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  Plaintiff has not engaged in substantial gainful activity since July 11, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: lupus (SLE), back disorder, peripheral neuropathy, chronic obstructive pulmonary disease (COPD), obesity, depression, and anxiety.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.

5.  Plaintiff has the residual functional capacity to perform light work with the following limitations: (1) no more than occasional postural activity; (2) avoid excessive environmental conditions (dust/fumes/odors/gases); and (3) only occasional contact with coworkers, supervisors, and the public due to moderate limitations in social functioning.

6.  Plaintiff is unable to perform any past relevant work.

7.  Plaintiff was born on August 4, 1970, and was 37 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

8.  Plaintiff has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills.

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

18

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from July 11, 2008, through the date of this decision.

(Docket No. 10, pp. 22-33 of 590). ALJ Pianin denied Plaintiff's request for DIB and SSI benefits (Docket No. 10, p. 33 of 590).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.     PLAINTIFF'S ALLEGATIONS

19

In her Brief on the Merits, Plaintiff alleges that the ALJ failed to appropriately apply the treating physician rule to the opinion of Plaintiff's treating physician, Dr. Mikhail (Docket No. 12, pp. 11-18 of 18).

## B.    DEFENDANT'S RESPONSE

While Defendant concedes that Dr. Mikhail is Plaintiff's treating physician, it contends that Dr. Mikhail's opinion is contrary to the clear weight of Plaintiff's objective medical record and is therefore not entitled to controlling weight (Docket No. 13, pp. 10-16 of 16).

## C.    DISCUSSION

### 1.    TREATING PHYSICIAN RULE

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

> [T]he regulations require the ALJ to always give good reasons in the notice of
> determination or decision for the weight given to the claimant's treating source's opinion.
> 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the
> case record, and must be sufficiently specific to make clear to any subsequent reviewers
> the weight the adjudicator gave to the treating source's medical opinion and the reasons for
> that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). It is a fundamental principle of

administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An

agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate

notice and consequently may result in a violation of an individual's constitutional right to due

process." *Id*. (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal

citations omitted)). While this Magistrate agrees with the ALJ's ultimate conclusion, she cannot

support the ALJ's failure to properly apply the treating physician rule.

As stated above, the treating physician rule involves two steps. First, an ALJ must specifically

state what weight, if not controlling, he assigns to a claimant's treating physician. *Blakley*, 581 F.3d at

406-07. Here, ALJ Pianin fulfilled this requirement by stating, albeit only using exhibit numbers, that

he assigned Dr. Mikhail's opinion "minimal weight" (Docket No. 10, p. 31 of 590). Section 1527(c)(2)

is then very clear that an ALJ must "always give good reasons in [his] notice of determination or

decision for the weight [he] give[s] to [a claimant's] treating source's opinion." 20 C.F.R. §

404.1527(c)(2). ALJ Pianin failed to take this step, stating in only broad terms his reasons for

discounting the opinion of Dr. Mikhail.

ALJ Pianin stated

> The medical evidence discussed above shows that the claimant's allegations of disabling
> physical impairments, disabling mental impairments, and pain, which are found in the
> claimant's disability reports and hearing testimony, are inconsistent with objective findings
> and subjective findings on examinations. The claimant's diagnoses, course of treatment,
> and medications, do not support the claimant's allegations. The claimant's progress notes

21

> do not support the claimant's allegations. The claimant's symptoms exceed the objective findings contained in the medical records. The claimant's testimony is inconsistent with the medical evidence of record, and it is not well supported by the medical evidence of record. Accordingly, the undersigned finds that the claimant's allegations and subjective complaints are not fully credible.

(Docket No. 10, p. 31 of 590).

With regard to his assessment of Dr. Mikhail's opinions, ALJ Pianin stated that the opinions "are not supported by the objective findings, clinical observations, treatment regimens, or medications prescribed. The claimant's lack of hospitalizations and current treatment, other than a low dose of Ativan . . . further supported the undersigned's analysis with respect to her depression and anxiety" (Docket No. 10, p. 31 of 590).

Dr. Mikhail concluded that Plaintiff could stand/walk and sit, without interruption, for less than two hours during an eight-hour workday (Docket No. 10, p. 502 of 590). Dr. Mikhail also reported that Plaintiff could only sit and stand for ten minutes at a time and must frequently change positions (Docket No. 10, p. 502 of 590). The doctor noted that Plaintiff could only occasionally lift ten pounds or less, only occasionally twist and stoop, rarely lift and/or carry twenty pounds, and never crouch/squat (Docket No. 10, p. 503 of 590). While the ALJ clearly disagreed with this assessment, he failed to specifically outline his reasons for discounting Dr. Mikhail's conclusions anywhere in his opinion. For example, Plaintiff first reported back pain to Dr. Mikhail on September 15, 2008 (Docket No. 10, p. 268 of 590). An x-ray showed only mild degenerative disease (Docket No. 10, p. 268 of 590). This diagnosis was confirmed by Dr. Lumapas on September 19, 2008 (Docket No. 10, p. 307 of 590). During a December 2008 Physical Residual Functional Capacity Assessment, Dr. Green determined that Plaintiff had no exertional limitations (Docket No. 10, p. 333 of 590). Even though this assessment occurred twenty months before Dr. Mikhail's examination, there is nothing in the

22

record to suggest Plaintiff's condition had deteriorated to the point reflected in Dr. Mikhail's assessment. Furthermore, Dr. Ko recommended Plaintiff undergo physical therapy and epidural steroid injections (Docket No. 10, p. 345 of 590). Plaintiff failed to follow up on either of these options, even after Dr. Mikhail suggested she have the injections (Docket No. 10, pp. 51, 363 of 590). ALJ Pianin had the opportunity to point out specific and fatal flaws within Dr. Mikhail's opinion using this objective medical evidence, as well as others contained in Plaintiff's record but instead chose to only paint broad strokes of inconsistency. This analysis simply does not satisfy the requirements of the treating physician rule.

This failure is even more evident in examining the ALJ's treatment of Dr. Mikhail's opinion of Plaintiff's mental residual functional capacity. Dr. Mikhail concluded that Plaintiff had marked restriction of activities of daily living as well as marked difficulties in maintaining social functioning and deficiencies of concentration, persistence, and pace (Docket No. 10, p. 505 of 590). Dr. Mikhail also reported that Plaintiff suffered from *repeated* episodes of decompensation (Docket No. 10, p. 505 of 590). Plaintiff's records indicate that she has suffered from some form of anxiety and depression since approximately September 2003 (Docket No. 10, p. 290 of 590). Plaintiff was started on Ativan some time in 2007 (Docket No. 10, p. 279 of 290). During her testimony Plaintiff indicated that the Ativan did not help, although her dosage remained the same for two and a half years (Docket No. 10, pp. 53-54 of 590). Plaintiff was also started on Cymbalta in June 2007 (Docket No. 10, p. 277 of 590). In September 2010, Dr. Mikhail started Plaintiff on Zoloft (Docket No. 10, p. 529 of 590). Despite her subjective complaints of increased anxiety and possible agoraphobia, Plaintiff admitted during her testimony that she has never been treated by a psychologist or psychiatrist for reasons that she could not explain (Docket No. 10, pp. 50, 56 of 590).

During a Psychological Evaluation in 2008, Dr. Zerba diagnosed Plaintiff with Depressive Disorder NOS and Panic Disorder without Agoraphobia (Docket No. 10, p. 312 of 590). Dr. Zerba found that Plaintiff had no limitations with regard to ability to understand and follow directions, pay attention and perform simple tasks, and relate to others in the work environment (Docket No. 10, p. 312 of 590). The doctor also concluded that Plaintiff's ability to withstand the stress and pressures of day-to-day work activity was only *moderately* impaired (Docket No. 10, p. 312 of 590). No where in her evaluation does Dr. Zerba mention Plaintiff having any episodes of decompensation (Docket No. 10, pp. 309-13 of 590). Neither did state agency examiner Dr. Umana (Docket No. 10, p. 328 of 590). ALJ Pianin had an opportunity to specifically refute Dr. Mikhail's opinion about Plaintiff's alleged mental residual functional capacity with these clear examples and again simply failed to do so.

While it may be true that the opinions of Dr. Mikhail should not ultimately be accorded controlling weight, despite Dr. Mikhail's status as Plaintiff's treating physician, ALJ Pianin did not go through the required analysis to arrive at that conclusion. The Sixth Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Cole v. Astrue*, 652 F.3d 653, 661 (6th Cir. 2011) (*quoting Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009). Therefore, it is the recommendation of this Magistrate that the opinion of the ALJ be reversed and the case be remanded to the Commissioner for further proceedings consistent with this opinion.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the opinion of the ALJ be reversed

24

and the case be remanded to the Commissioner for further proceedings consistent with this opinion.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   February 21, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto

has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any

party may object to the report and recommendations within fourteen (14) days after being served with

25

a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

26